IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LARRY D. JOHNSON, M22661, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Case No. 24-cv-1385-DWD |
| BRADLEY SADLER, | ) |
| JARED PHILLIPS, | ) |
| AARON TAYLOR, | ) |
| TROY SLINKARD, | ) |
| TYLER ROBINSON, | ) |
| TYLER CHOATE, | ) |
| ANTHONY WILLS, | ) |
| MATTHEW DULANEY, | ) |
| JANE DOE, | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER

**DUGAN, District Judge:**

Plaintiff Larry Johnson, an inmate of the Illinois Department of Corrections (IDOC) currently incarcerated at Pontiac Correctional Center, brings this action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights at Menard Correctional Center (Menard). Plaintiff alleges that the Defendants used excessive force against him and that Defendant Wills failed to take action in response to grievances about the incident. Defendants filed a Motion for Summary Judgment (Doc. 51) on the issue of whether Plaintiff exhausted his administrative remedies prior to filing this lawsuit, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). Plaintiff timely replied (Doc. 52) and the matter is now ripe for consideration. For reasons explained, Defendants' Motion is denied, and this case may proceed to merits discovery.

## BACKGROUND

Plaintiff initiated this lawsuit by filing a Complaint on May 24, 2024, and by filing an amended complaint (Doc. 7) on June 6, 2024.  Plaintiff alleged that on October 10, 2023, Defendants Sadler, Phillips, Taylor, Slinkard, and Robinson used excessive force against him while he was on the prison yard.  (Doc. 7 at 10).  He specifically alleges that they sprayed him with insprajet and mace, shot him with pepper balls, and otherwise physically battered him.  During the fracas, Defendant Dulaney grabbed and squeezed his genitals and also tore out some of his dreadlocks.  (Doc. 7 at 11).  Plaintiff was escorted to a room where he was cuffed to a stool that was attached to the floor.  Defendant Sadler then entered the room and struck Plaintiff's face with a closed fist.  Defendant Choate also entered and sprayed Plaintiff's face with mace while Plaintiff was restrained.  (Doc. 7 at 11).  Plaintiff alleges that Jane Doe nurse entered the room to check his blood pressure but otherwise refused care despite his pleas for help and his visible injuries.  (Doc. 7 at 11).

Plaintiff alleges he filed multiple grievances about the incident and his desire for medical care, but as of April of 2024 he had not received the care he desired.  He argues that Defendant Wills must have been aware of his condition because some of the grievances were submitted as emergencies and Wills was a signatory on those grievances.  Plaintiff also contacted the Governor's Office about the lack of a response from the prison, and in December of 2023 he got a responsive memorandum from Wills indicating an investigation was ongoing and that Plaintiff would be notified of the outcome.  (Doc. 7 at

12, 30). Plaintiff's complaint included additional allegations that were severed into separate lawsuits because they concerned temporally distinct incidents.

The Court allowed Plaintiff to proceed on the following claims:

**Claim 1:** Eighth Amendment excessive force claim against Defendants Sadler, Dulaney, Phillips, Taylor, Slinkard, Robinson, and Choate, for their conduct on October 10, 2023;

**Claim 2:** Eighth Amendment deliberate indifference claim against Jane Doe 1 for denying Plaintiff medical care on October 10, 2023;

**Claim 3:** Eighth Amendment deliberate indifference claim against Defendant Wills for failing to thoroughly investigate Plaintiff's multiple grievances;

(Doc. 12).

The parties undertook discovery on the exhaustion of administrative remedies, and in doing so they have identified one grievance relevant to the exact claims in this case. They have also identified other grievances that are tangentially related. Plaintiff has submitted a response accompanied by relevant exhibits that detail his efforts to follow the status of his grievances.

### FINDINGS OF FACT

On October 18, 2023, Plaintiff filed grievance K4-1023-0914 as an emergency, but on October 25, 2023, Warden Wills deemed the grievance a non-emergency. The grievance alleges:

> I am grieving the fact that on 10/10/23 at around 2pm on the restrictive housing yard #5 I was extracted by tactical team members by excessive force. During the extraction I was punched, kicked, sprayed with multiple cans of mace, the insprajet and shot with multiple pepper balls. Once I was

> detained and in cuffs on the ground the tact team members continued to punch and kick me in my face, head, and body. One tact team member even intentionally pulled some of my dreadlocks out of the back of my head and told he me is keeping them as a souvenir and trophy. Once removed from the yard the officers escorting me inside of the North 2 building's infirmary the officers deliberately ran my head into the gate opening before going inside the building. Once inside the infirmary I was taken to the interview room to the furthest left and cuffed to the floor and ordered to sit there and don't move. Then Lt. B. Sadler entered the room in a rage and hit me in the face while I was cuffed, shackled, and chained to the floor. Then he left and a few minutes later another tact team member came and stood at the door of the interview room I was in and sprayed mace into my face while I was cuffed, shackled and chained to the floor.

(Doc. 51-7 at 3-4). The grievance was stamped as received for first level of review on October 26, 2023, and for second level review on November 13, 2023. (Doc. 51-7 at 3). On July 1, 2024,[1] a grievance officer recommended that the grievance be deemed resolved because the matter was pending investigation by internal affairs. (Doc. 51-7 at 1). On July 9, 2024, Warden Kevin Reichert concurred with the grievance officer's response. The Administrative Review Board (ARB) received Plaintiff's grievance on July 17, 2024, and a member of the ARB declared that on July 31, 2024, the grievance was still awaiting a disposition from the ARB. (Decl. of Paige Long, Doc. 51-6 at p.4 ¶ 11). In response to the Motion for Summary Judgment, Plaintiff supplied a final disposition from the ARB for grievance K4-1023-0914, dated August 6, 2024. The disposition indicated the ARB deemed the matter "Resolved. The investigation into this matter is ongoing." (Doc. 52 at 26).

---

[1] The grievance officer's response had a "date of review" of April 29, 2024, but the grievance officer's electronic signature on the recommendation line was dated July 1, 2024. (Doc. 51-7 at 1).

In relation to grievance K4-1023-0914, Plaintiff also tendered handwritten request slips that he submitted at the prison inquiring about the status of the grievance. On April 18, 2024, he was informed that grievance K4-1023-0914 had been answered on November 1, 2023, and returned to him. (Doc. 52 at 22). When he inquired a second time, on April 25, 2024, he was informed that the grievance was pending second level review. (Doc. 52 at 23). These queries and the responses from the prison are also cataloged in Plaintiff's CHAMPS counseling summary. (Doc. 51-4 at 4). Plaintiff also tendered copies of correspondence from the Governor's Office from December 4, 2023, acknowledging receipt of correspondence from him, and a December 8, 2023, memorandum from Defendant Wills indicating he had received correspondence from the Governor's Office and that an investigation into Plaintiff's allegations was ongoing and that he would be notified of the decision. (Doc. 52 at 42-43).

Aside from grievance K4-1023-0914, Plaintiff submitted two additional grievances on October 18, 2023—grievances K4-1023-0906 and K4-1023-0916. Grievance K4-1023-0916 concerned Defendant Dulaney's alleged conduct of grabbing and squeezing Plaintiff's genitals during the yard incident. (Doc. 52 at 38-39). On October 25, 2023, Defendant Wills expedited the grievance for emergency processing, and on October 26, 2023, a grievance officer recommended the grievance be deemed resolved because it was forwarded to internal affairs for investigation and PREA protocol was initiated. (Doc. 52 at 36. Wills concurred with this recommendation on November 3, 2023. (Doc. 52 at 36). On March 19, 2024, the ARB denied grievance K4-1023-0916 because the internal affairs investigation concluded the allegations were unsubstantiated. (Doc. 52 at 41). Plaintiff

also included a March 25, 2024, memorandum from Warden Wills informing him that his allegations were found to be unsubstantiated and that he could grieve that finding if he wished to challenge it.  (Doc. 52 at 44).

By contrast, grievance K4-1023-0906 was deemed a non-emergency and was forwarded to the counselor for a first level response on October 26, 2023.  (Doc. 52 at 35).  This grievance described Plaintiff's injuries from the battering and his desire for care.  (Doc. 52 at 54-55).  In the grievance, Plaintiff clearly described the interaction with Jane Doe 1 whom he alleges took his blood pressure but otherwise refused treatment despite his visible injuries.  Plaintiff explained that he was unable to get Jane Doe 1's name because she refused to give it to him, and he could not see due to the mace in his eyes.  He also explained he is legally blind without special contact lenses, and the mace impaired the function of his contacts.  (Doc. 52 at 55).  On February 5, 2025, a memo was sent from the nursing supervisor to the counselor/grievance office concerning grievance K4-1023-0906.  The nursing supervisor indicated she was writing in response to the grievance transmitted to her office for a response on November 1, 2023.  She indicated that Plaintiff was seen for chemical exposure on October 10, 2023, and for right side pain on November 24, 2023.  She noted he was seen by the doctor on July 1, 2024.  In sum, she indicated that Plaintiff's medical needs had been addressed as of the writing of the memo on February 5, 2025.  (Doc. 52 at 56).  The Menard grievance log submitted by the Defendants reflects that grievance K4-1023-0906 still had not yet been returned by the grievance office to Plaintiff, and the log contains no final disposition for the grievance.  (Doc. 51-2 at 2).  This is in contrast to grievances K4-1023-0914 and K4-1023-0916, which

both show on the log dates for processing at all levels of Menard review, as well as final dispositions. (Doc. 51-2 at 2). The original copy of grievance K4-1023-0906 indicates that the counselor signed off on the grievance for it to be returned to Plaintiff on February 11, 2025. (Doc. 52 at 54).

Plaintiff also included a July 26, 2024, memorandum from Defendant Wills indicating that he was in receipt of concerns Plaintiff sent to the Governor's office about grievance processing. (Doc. 52 at 69). In the memo, Wills indicated that grievance records showed Plaintiff's grievances had been received and were being processed. Plaintiff was advised to send written correspondence to the grievance office if he wished to know the status of a specific grievance. (Doc. 52 at 69).

## CONCLUSIONS OF LAW

A. Legal Standards

Summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In determining a summary judgment motion, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted). Courts generally cannot resolve factual disputes on a motion for summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.") (internal quotation marks and citation omitted). However, when the motion for summary judgment pertains to a prisoner's failure to

exhaust administrative remedies, the Seventh Circuit has instructed courts to conduct an evidentiary hearing and resolve contested issues of fact regarding a prisoner's efforts to exhaust.  *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008).[2]  After hearing evidence, finding facts, and determining credibility, the court must decide whether to allow the claim to proceed or to dismiss it for failure to exhaust.  *Wilborn v. Ealey*, 881 F.3d 998, 1004 (7th Cir. 2018).  The court is not required to conduct an evidentiary hearing if there is no genuine dispute of material fact, and the determination is purely legal.  *See e.g.*, *Walker v. Harris*, 2021 WL 3287832 * 1 (S.D. Ill 2021); *Miller v. Wexford Health Source, Inc.*, 2017 WL 951399 *2 (S.D. Ill. 2017).

The Prison Litigation Reform Act (PLRA) provides that a prisoner may not bring a lawsuit about prison conditions unless and until he has exhausted all available administrative remedies.  42 U.S.C. § 1997e(a); *Pavey*, 544 F.3d at 740.  "The exhaustion requirement is an affirmative defense, which the defendants bear the burden of proving." *Pavey v. Conley*, 663 F.3d 899, 903 (7th Cir. 2011).  For a prisoner to properly exhaust his administrative remedies, the prisoner must "file complaints and appeals in the place, and at the time, the prison's administrative rules require."  *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002).  "[A] prisoner who does not properly take each step within the administrative process has failed to exhaust state remedies."  *Id.* at 1024.

---

[2]  The Supreme Court's recent opinion in *Perttu v. Richards*, 605 U.S. 460 (2025), held that if the facts necessary for a ruling on exhaustion are intertwined with the merits of the claim, a jury trial is required.  But the *Perttu* Court did not go so far as to extend the Seventh Amendment right to a jury trial to all exhaustion disputes.  In this case, there is no intertwinement of the facts, so *Perttu* does not require that this issue be determined at a jury trial.

There are no exceptions to the exhaustion requirement, however, the Supreme Court and Seventh Circuit have emphasized in recent years that the exhaustion process must be available. An "available" remedy is one that is "capable of use for the accomplishment of a purpose" and "is accessible or may be obtained." *Crouch v. Brown,* 27 F.4th 1315, 1320 (7th Cir. 2022) *citing Ross v. Blake*, 578 U.S. 632, 642 (2016). If availability is at issue, the Court must resolve that issue before proceeding to the merits of the exhaustion dispute. *Wallace v. Baldwin,* 55 F.4th 535, 539 (7th Cir. 2022) (the district court must first consider the threshold question of if exhaustion was available). There are three circumstances that might support a finding of unavailability: (1) a process may be unavailable if it is so opaque that it becomes incapable of use; (2) a process may be unavailable if administrators thwart an inmate from using it via machination, misrepresentation, or intimidation; or, (3) a process may be unavailable if it operates as a "dead end" with officers unable or consistently unwilling to provide any relief for aggrieved inmates. *Ross v. Blake,* 578 U.S. 632, 643-44 (2016).

In *Dole* and *Gooch,* the Seventh Circuit considered situations where a process was unavailable due to acts or misrepresentations by prison administrators. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (finding that an inmate did all he could to exhaust a grievance when he placed the appeal in his cell bars for mailing, but it got lost and he had no direction on what to do about a lost grievance); *Gooch v. Young,* 24 F.4th 624 (7th Cir. 2022) (finding the grievance process was unavailable where prison staff threatened Plaintiff and refused to give him the appropriate grievance form). In *Hernandez, Smallwood,* and *Reid* the Seventh Circuit considered instances when a process

was unavailable due to complexity or an inmate's inability to use the process. *See Hernandez v. Dart*, 814 F.3d 836, 842-43 (7th Cir. 2016) (finding that the jail grievance process was unavailable to an inmate who was hospitalized after excessive force and had no information about how to file a grievance); *Smallwood v. Williams*, 59 F.4th 306 (7th Cir. 2023) (discussing an inmate's ability to understand the process in light of his IQ, as well as the possibility the inmate was given misinformation about the process); *Reid v. Balota,* 962 F.3d 325, 330 (7th Cir. 2020) (finding the process unavailable where mixed messages about how to proceed made the process obscure). Finally, in *Wallace v. Baldwin*, the Seventh Circuit recently remanded a case to the district court for a more thorough consideration of the availability in light of the inmates' allegations that the process was a dead end for their particular issue. 55 F.4th 535 (7th Cir. 2022) (finding that the district court should have considered the inmates' evidence that other inmates got no response to grievances about double-celling, as well as the evidence the prison may simply reject a double-celling grievance as lacking merit).

      As an inmate in the IDOC, Plaintiff was required to follow the grievance process outlined in the Illinois Administrative Code. 20 ILL. ADMIN. CODE § 504.800, et seq. (2017). An inmate may request that a grievance be handled as an emergency by forwarding it directly to the CAO. 20 ILL. ADMIN. CODE § 504.840. If it is determined that there exists a substantial risk of imminent personal injury or other serious or irreparable harm, the grievance is handled on an emergency basis, which allows for expedited processing of the grievance. *Id.*

If the inmate is not satisfied with the CAO's response, he can file an appeal with the IDOC Director through the Administrative Review Board (ARB). 20 ILL. ADMIN. CODE § 504.850(a). The ARB must receive the appeal within 30 days of the date of the CAO's decision. Id. The inmate must attach copies of the responses from the grievance officer and CAO to his appeal. Id. If an inmate is appealing a grievance that the CAO determined to be of an emergency nature, then the ARB shall expedite processing of the appeal. 20 ILL. ADMIN. CODE § 504.850(f).

B. Analysis

The Defendants contend that Plaintiff simply sued before exhausting his remedies, while Plaintiff counters that the grievance process was not available. Specifically, Plaintiff contends he did not know what to do about a grievance that was not garnering a response, he feared his grievance was lost, and he believed the response would be a dead end based on a similar response he got to a grievance filed the same day. The Court must resolve the issue of availability before considering the substantive dispute about exhaustion.

The Defendants contend that the grievance process was available by reference to other grievances that Plaintiff filed and fully exhausted during the relevant timeframe. They also provided evidence that in April of 2024, Plaintiff inquired multiple times about the status of grievance K4-1023-0914, and on both occasions he was provided a timely update indicating the grievance was still being processed.

By contrast, Plaintiff contends he encountered delayed response times on multiple occasions with relation to the excessive force incident that is the subject of this lawsuit,

and he also received responses he perceived as indications the grievance process was a dead end.  First, as to delayed grievance processing, Plaintiff's exhibits demonstrate that he filed at least six grievances about the alleged incident of excessive force.  Grievances K4-1023-0906 (filed 10/18/23), K4-1123-1482 (filed 11/17/23), K4-1123-1593 (filed 11/19/23), and K4-1123-1772 (filed 11/29/23) all dealt with his desire for medical care for his injuries.  Grievance K4-1023-0914 (filed 10/18/23) dealt with the staff conduct during the excessive force, and Grievance K4-1023-0916 (filed 10/18/23) dealt with an alleged sexual assault by a defendant during the incident.  The first three medical grievances were denied emergency status, and it does not appear from the record evidence that they got any responses until at least February 11, 2025.  Specifically, grievances K4-1023-0906, K4-1123-1482, and K4-1123-1593 are all listed in the Defendants' grievance processing chart as overdue for a response, with no indication that they ever got responses even from the first level counselor stage.  (Doc. 51-3 at 2).  Despite the lack of evidence from the Defendants about the four medical grievances, Plaintiff submitted first level counselor responses accompanied by memorandums from the healthcare unit that were all dated February 11, 2025.  (Doc. 52 at 54-62).  Grievance K4-1123-1772 was submitted on November 29, 2023, concerning Plaintiff's ongoing injuries from the alleged excessive force and it was deemed an emergency by Warden Wills on December 1, 2023.  (Doc. 52 at 48-49).  Despite being deemed an emergency by the Warden, the grievance did not get a response from the grievance office until November 20, 2024, nearly an **ENTIRE YEAR** after the Warden deemed it an emergency.  (Doc. 52 at 47).  Collectively,

the four medical grievances show a substantial delay or total non-response in the processing of Plaintiff's grievances about the excessive force incident.

Grievances K4-1023-0914 and K4-1023-0916 took a slightly different trajectory than the medical grievances. Grievance K4-1023-0916 concerning the alleged sexual misconduct by Defendant Dulaney was deemed an emergency by the Warden on October 25, 2023, and by November 3, 2023, it had completed the entire grievance process at Menard. (Doc. 52 at 50-53). The institution recommended the grievance be resolved because an investigation was ongoing into the alleged misconduct. On March 19, 2024, the Administrative Review Board found the issue appropriately addressed by the prison and denied the grievance because the internal investigation had determined the allegations of sexual misconduct were not substantiated. (Doc. 52 at 41). On March 25, 2024, Warden Wills sent Plaintiff a memorandum summarizing the findings of the internal investigation that indicated his concerns were unsubstantiated, but noted he had a right to grieve the findings of the investigation. (Doc. 52 at 42).

By contrast, Grievance K4-1023-0914 about the alleged excessive force by staff was denied emergency status on October 25, 2023. (Doc. 52 at 26). The grievance was returned from the first level review by the counselor on November 3, 2023, and it was received for grievance officer review on November 13, 2023. (Doc. 51-3 at 2). Plaintiff wrote the Governor's Office about the issue in December of 2023, and in December of 2023 Warden Wills wrote him a responsive memorandum indicating the investigation was ongoing. (Doc. 52 at 42-43). On April 19, 2024, Plaintiff wrote his counselor for an update and was told K4-1023-0914 had been returned to him in November. (Doc. 52 at

22). On April 25, 2024, he wrote for another update and was told K4-1023-0914 was pending second level review. On July 9, 2024, K4-1023-0914 was deemed resolved by the grievance officer and Warden because the internal investigation was ongoing. (Doc. 52 at 27). On August 6, 2024, the ARB deemed the grievance resolved because the investigation by internal affairs was ongoing. (Doc. 52 at 30).

  The facts Plaintiff has presented demonstrate characteristics of all three types of unavailability. The four medical grievances, including one that was deemed an emergency, took between a year and nearly sixteen months to receive responses. In the approximately sixteen months, three of the medical grievances only received first level counselor responses, with no indication in the records of if they have ever been fully processed by the prison to date. Plaintiff's grievance about the excessive force also took nine months to be processed at all levels of review. While this is not quite as extreme, it is noteworthy that he inquired about the status in December of 2023 and April of 2024 only to be ambiguously told the investigation was ongoing with no projection about when it might conclude. Together, these facts suggest a scenario where the grievance process was practically unavailable due to the dilatory nature of the prison's grievance processing. Plaintiff argues that because the grievance process has an aspirational deadline for grievances to be processed by the grievance officer within 2 months, that these long processing times alone show unavailability. Though the 2-month timeframe is not treated as concrete in the caselaw, it is fair to argue that processing that took anywhere from 9-16 months is nowhere near the goal of completion within 2 months when reasonably feasible. Plaintiff's unavailability argument related to the timeliness of

grievance processing is well-placed and plausibly supports a finding the process was unavailable because the prison refused to process the grievances for an inexcusably long time.

Aside from the slow processing, Plaintiff also argues that the grievance process was a dead end for grievance K4-1023-0914 because he knew from grievance K4-1023-0916 that prison officials would merely state an investigation was ongoing without taking any substantive action. This theory is supported by Plaintiff's own experience in this case because both grievances K4-1023-0916 and K4-1023-0914 got the boilerplate response from prison officials at the local institutional level that the matter was being investigated internally, and thus the grievance would be deemed resolved. This form of deference, with no guidance on when the investigation might conclude or if Plaintiff could have any input, is like getting no response at all or like officials refusing to address the issue for non-substantive reasons. Since the *Wallace* case that set forth the standards for finding a dead end in the grievance context, a handful of district courts have addressed the dead-end theory[3] and only one the undersigned located found that a dead end was established.

In *Adamczyk v. IDOC*, 2025 WL 2771380 at *5 (S.D. Ill. Sept. 29, 2025), a judge concluded that the grievance process was a dead end for a civil detainee seeking to challenge punitive conditions of his confinement because, in response, grievance officers indicated that conditions were an administrative decision that they did not control. The

---

[3] *See e.g., Dagans v. Cecil*, 2024 WL 3830275 (S.D. Ill. Aug. 15, 2024) (finding that Plaintiff's conclusory allegations that the officers did not respond to his grievances were not enough to demonstrate a dead end); *Austin v. Rhoades*, 2023 WL 2374361 (S.D. Ill. Mar. 6, 2023) (finding that a Plaintiff did not substantiate the dead end theory where he offered no evidence that he actually tried to grievance the strip search policy before suing to no avail).

*Adamczyk* Court relied on just a single grievance wherein the counselor, grievance officer, and warden, all agreed that the grievance should be denied because the conditions of detention and placement for sexually dangerous civil detainees were administrative decisions that the prison itself could not influence. *Adamczyk v. IDOC*, Case No. 22-cv-863 (S.D. Ill.) (Doc. 134-2 at 25-28). Here, Plaintiff is similarly situated in that he has just two grievances showing the situation he describes. Though the Seventh Circuit has said that establishing a dead end is a tall task, the Court finds that Plaintiff's evidence is sufficient in this case to establish that he faced a dead end when grievances K4-1023-0914 and K4-1023-0916 both were deemed "resolved" at the prison level simply because an internal investigation was going on, with no further commentary on if Plaintiff had any recourse. By deeming the grievances resolved with no further guidance, the prison grievance process in essence refused to address Plaintiff's concerns and shirked the responsibility to another department. This made the process a dead end.

The outcome of grievance K4-1023-0916 also leads to the third basis for potential unavailability. This grievance concerned Plaintiff's allegation that during the October 10, 2023, excessive force incident, Defendant Dulaney sexually assaulted him by grabbing and gratuitously squeezing his genitals. The grievance was expedited as an emergency and by November 3, 2023, all levels of the prison's internal grievance process had deemed the grievance "resolved" because an investigation was ongoing. By contrast, in March of 2024, the ARB denied the grievance because the internal investigation had concluded and found Plaintiff's allegations unsubstantiated. (Doc. 52 at   The ARB's ruling diverged from the prison's because instead of deferring to the internal investigation, it

substantively decided that the investigation results were correct. (Doc. 52 at 41). A few weeks after the ARB ruled, Plaintiff got a memorandum from Warden Wills detailing the results of the same investigation that the ARB referenced, but the memorandum specifically said that Plaintiff could grieve the outcome of the investigation if he was unsatisfied. (Doc. 52 at 44). This bit of information makes the grievance process opaque or difficult to understand with relation to internal investigations. Why did the ARB substantively rule on the results of the investigation if the results had not even been disclosed to Plaintiff yet, and if he was supposed to have an opportunity to substantively grieve the results? If Plaintiff tried to submit a substantive grievance about the outcome of the investigation, would it have been denied as duplicative? Why was Plaintiff not informed at any earlier point in the grievance process when the investigation was mentioned that he would eventually have a chance to appeal the outcome if he disagreed with it? It seems that the ARB waited for the investigation to be concluded for grievance K4-1023-0916 before it ruled, but then for grievance K4-1023-0914 it did not wait for the investigation to conclude, instead just agreeing the grievance was "resolved" because the investigation was ongoing. This disparate handling of two very similar grievances makes it unclear if there is a standard process for handling a grievance linked to a pending internal investigation, and it makes it unclear if inmates really can substantively appeal an investigation once it is concluded.

For all of the foregoing reasons, the Court finds that the grievance process was not available to Plaintiff for grievance K4-1023-0914. This finding is sufficient to cover Claims 1 and 3 against Defendants Sadler, Phillips, Taylor, Slinkard, Robinson, Choate, and

Wills. To the extent that Wills argues that grievance K4-1023-0914 did not mention him, Plaintiff's additional evidence about his efforts to contact Wills regarding grievance processing are sufficient to demonstrate Wills was on notice of the issue with an opportunity to respond. Defendant Dulaney did not raise the affirmative defense of failure to exhaust, and it is clear grievance K4-1023-0916 exhausted the claim against him prior to the filing of this suit.

This leaves Claim 2 against Jane Doe, the nurse that Plaintiff first saw for care on October 10, 2023. By oversight of the parties and the Court, Jane Doe was omitted from the John Doe identification process that occurred in the Fall of 2024. The Court will set a new schedule to identify Jane Doe. It is apparent from the grievance records that grievance K4-1023-0906, submitted on October 18, 2023, is sufficient to describe Jane Doe because it identifies the very encounter described in the complaint. The Court finds it unnecessary to reconsider the exhaustion process with relation to Jane Doe because the records submitted with the current round of summary judgment briefing plainly show that grievance K4-1023-0906 was left pending at the prison level from October 18, 2023, until at least February 11, 2025. (Doc. 52 at 54-56). As the Court discussed in relation to availability, this extreme lag of 16 months rendered the process unavailable. Therefore, once Jane Doe is identified, served, and files an answer, she shall join the rest of the parties at the merits stage of the case.

## DISPOSITION

Defendants' Motion for Summary Judgment (Doc. 51) on the issue of exhaustion of administrative remedies is **DENIED** in full because the administrative remedy process

was not available for the reasons explained in this Order.  This finding applies to all Defendants named in all claims (Claims 1-3), including Jane Doe.

Plaintiff shall have 21 days to file a Notice containing as much descriptive information as he possesses about Jane Doe.  The Warden of Menard shall then have 21 days to tender responsive information and to file a Notice of Compliance.  Plaintiff shall have 21 days from the Warden's Notice of Compliance to move to substitute Jane Doe.  If Plaintiff fails to meet this deadline, Jane Doe may be dismissed for failure to prosecute.

**IT IS SO ORDERED.**

Dated:  December 29, 2025

/s/ *David W. Dugan*

---

DAVID W. DUGAN
United States District Judge